UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| STEPHANIE GOOD, LORI A. SPELLMAN, and ALLAIN L. THIBODEAU, individually and on behalf of all others similarly situated, | ) ) ) ) | |
| | ) | |
| Plaintiffs, | ) ) | |
| v. | ) | CV-05-127-B-W |
| | ) | |
| ALTRIA GROUP, INC., and PHILIP MORRIS USA, INC., | ) ) | |
| | ) | |
| Defendants. | ) | |

## ORDER ON DEFENDANT PHILIP MORRIS USA, INC.'S MOTION FOR SUMMARY JUDGMENT

Long-time smokers of Marlboro Lights cigarettes, Stephanie Good, Lori Spellman, and Allain Thibodeau filed a class action against Altria Group, Inc. (Altria) and Philip Morris USA, Inc. (Philip Morris), claiming that Altria and Philip Morris deliberately deceived them about the true and harmful nature of light cigarettes, thereby violating the Maine Unfair Trade Practices Act and enriching themselves unjustly. Philip Morris moved for summary judgment on the ground that federal law expressly pre-empts these state causes of action. Based on *Cipollone v. Liggett Group,* 505 U.S. 504 (1992) and its progeny, this Court agrees that federal law pre-empts the Plaintiffs' causes of action and grants summary judgment in favor of Philip Morris.[1]

## I.        Statement of Facts[2]

---

[1] Philip Morris also raised two other arguments in its motion: that the claims were implied pre-empted and that Plaintiffs' claim under the Maine Unfair Trade Practices Act was barred by statutory exemption. Because this Court has granted summary judgment on express pre-emption grounds, it has not reached these additional arguments.

[2] The parties raise several objections to the statements of material facts, which this Court has addressed in a separate, contemporaneous order. *See Order on Parties' Objs. to the Statements of Mat. Facts.*

### a.  The Parties

The Plaintiffs, Maine residents, allege not only that they are long-time Marlboro Lights smokers, but also that they represent a class of all similarly-situated consumers in Maine.[3]  *First Am. Compl.* at ¶¶ 7-9, 41-51 (Docket # 12).   Altria is a Virginia corporation, which through its wholly owned subsidiary, Philip Morris, engaged in the business of designing, manufacturing, promoting, marketing, distributing and selling Marlboro Lights and Cambridge Lights brand cigarettes.[4]  *Id.* at ¶¶ 10, 11.

### b.  Congressional regulation[5]

Shortly after the Surgeon General's Advisory Committee on Smoking and Health issued its 1964 report concluding that cigarette smoking was a health hazard, Congress responded by enacting the Federal Cigarette Labeling and Advertising Act (FCLAA) in the face of impending regulation by federal agencies and the States.  *Def.'s Statement of Undisputed Facts* at ¶¶ 1-3 (Docket # 21)(DSUF); *Pls.' Opposing Statement of Mat. Facts* at ¶ 2 (Docket # 51)(POSMF).  The purpose of FCLAA, enacted in 1965, was "to establish a comprehensive Federal program to deal with cigarette labeling and advertising with respect to any relationship between smoking and health…."  *DSUF* at ¶ 3; 15 U.S.C. § 1331.  By means of FCLAA, Congress specified the text of the warning labels that manufacturers were required to place on cigarette packages and expressly prohibited

---

[3] On September 21, 2005, the Plaintiffs moved this Court for class certification.  *Pls.' Mot. for Class Certification* (Docket # 10).  Defendants objected and moved to stay.  *Defs.' Obj. to Pls.' Mot. for Class Certification* (Docket # 28); *Joint Mot. to Stay* (Docket # 23).  This Court granted Defendants' Motion to Stay pending resolution of this motion.  *Good v. Altria Group, Inc.*, 231 F.R.D. 446 (D. Me. 2005).

[4] The motion for summary judgment was filed only by Philip Morris.  At oral argument, the parties acknowledged as a practical matter the Court's ruling would be equally applicable to Altria.  This opinion refers only to Philip Morris, since it is the sole moving party.

[5] Consistent with the "conventional summary judgment praxis," the Court recounts the facts in a light most favorable to Plaintiffs' theory of the case, consistent with record support.  *Gillen v. Fallon Ambulance Serv.,* 283 F.3d 11, 17 (1st Cir. 2002).  The Court has relied either on the uncontested facts or on Plaintiffs' version, if contested.

others from imposing additional requirements with respect to cigarette labeling. *DSUF* at ¶¶ 4-5; 15 U.S.C. § 1333-1334. FCLAA, however, did not require the use of a "Lights" descriptor or representations that cigarettes are purportedly "lower in tar and nicotine". *POSMF* at ¶ 5.

Originally due to expire in 1969, Congress amended FCLAA that year to ban cigarette advertisements on any medium of electronic communication subject to the jurisdiction of the Federal Trade Commission (FTC), taking cigarette advertisements off television and radio. *DSUF* at ¶¶ 6-7. Also in 1969, Congress changed the required warning labels on cigarette packages and expressly provided that "no requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act". *DSUF* at ¶¶ 8-9; 15 U.S.C. § 1334. The Senate report states that these amendments were intended to ensure national uniformity with respect to the advertising and promotion of cigarettes. *DSUF* at ¶ 12. *See also DSUF* at ¶ 1. However, none of the changes added any provisions with regard to the specific use of a "Lights" descriptor or representations that cigarettes are purportedly "lower in tar and nicotine". *POSMF* at ¶ 12.

In 1984, Congress amended FCLAA again, this time to require a series of rotating health warnings.[6] *DSUF* at ¶ 13; *POSMF* at ¶ 13. Over time, Congress considered, but rejected, legislation aimed at further regulating tobacco, including legislation that would have required cigarette manufacturers to identify tar and nicotine yields on cigarette

---

[6] These are the statutorily mandated warnings, each beginning with "SURGEON GENERAL'S WARNING": "Smoking Causes Lung Cancer, Heart Disease, Emphysema, And May Complicate Pregnancy"; "Quitting Smoking Now Greatly Reduces Serious Risks to Your Health"; "Smoking By Pregnant Women May Result in Fetal Injury, Premature Birth, And Low Birth Weight"; and "Cigarette Smoke Contains Carbon Monoxide." *DSUF* at ¶ 13.

packages and would have given the Food & Drug Administration (FDA) authority over cigarettes. *DSUF* at ¶¶ 14-15.

### c.   FTC: Early Involvement with the Tobacco Industry

The FTC was created to enforce the nation's antitrust and consumer protection laws. The aim of consumer protection laws is to prevent unfair or deceptive business practices, including unfair or deceptive advertising. *DSUF* at ¶ 17.  Since the 1930s, the FTC has exercised its authority to monitor cigarette advertisements and promotions in several respects and has used several enforcement mechanisms such as cease-and-desist orders, corrective advertising, bans, posting of bonds, disgorgement of profits, and financial penalties.[7] *DSUF* at ¶¶ 20, 22; *POSMF* at ¶¶ 20, 22.  In the 1940s, the FTC addressed tar and nicotine claims in cigarette advertisements, but not the specific descriptors "lights" and "lowered tar and nicotine". *DSUF* at ¶ 23; *POSMF* at ¶ 23.

In 1955, the FTC issued Cigarette Advertising Guides for staff use in evaluating cigarette advertising, asking that the industry substantiate claims regarding tar and nicotine yields. *DSUF* at ¶ 24; *POSMF* at ¶ 24.  Nevertheless, in the 1950s, different manufacturers used different test methods, and it was difficult to compare tar and nicotine yields among brands. *DSUF* at ¶ 25.  In 1959, after an FTC statement that it would file enforcement actions against disclosures it deemed to be *per se* deceptive or unsubstantiated health claims, all seven major manufacturers agreed to delete all tar and nicotine claims from advertising. *DSUF* at ¶ 26; *POSMF* at ¶ 26.  In regulating cigarette advertising and promotions, the FTC has relied on the views and findings of the scientific community and other government agencies, such as the U.S. Department of Health and

---

[7] Any final action taken by the FTC is subject to judicial review.  *POSMF* at ¶ 20.

Human Services, and has developed expertise in assessing the impact of advertising claims on the general public. *DSUF* at ¶¶ 19, 21.

### d. FTC: The FTC Method

The FCLAA expressly preserved the authority of the FTC to regulate and proscribe unfair or deceptive acts or practices in the advertising of cigarettes, although even the FTC was precluded from requiring additional requirements on cigarette packages. *DSUF* at ¶¶ 5, 11; *POSMF* ¶ 5; 15 U.S.C. § 1336. In 1964, after the Surgeon General's report, the FTC proposed a Trade Regulation Rule that would have prevented any cigarette label or advertisement from stating or implying without substantiation that smoking an advertised brand promotes good health or physical well-being, is not a hazard to health, or is less of a hazard to health than smoking other brands and noted that claims regarding lowered tar and nicotine could be deceptive without an adequate warning and scientific support. *DSUF* at ¶¶ 27-28. The Trade Regulation Rule was vacated by the voluntary agreement of the cigarette companies to subject themselves to a Cigarette Advertising Code and the enactment of FCLAA that same year. *DSUF* at ¶¶ 29-31; *POSMF* at ¶¶ 29-30.

In 1966, the FTC, prompted by its belief that a scientific consensus had emerged regarding the hazards of tar and nicotine in cigarettes, proposed a standardized method for measuring tar and nicotine levels. *DSUF* at ¶¶ 32-35; *POSMF* at ¶¶ 33-35. Known as the FTC or Cambridge Method, this method involves detailed specifications pursuant to which a machine smokes each cigarette the same way to the same length and the particulate matter is collected on a pad and measured for tar and nicotine content. *DSUF* at ¶¶ 35-38; *POSMF* at ¶¶ 35, 37. The FTC established its own testing lab to measure tar

5

and nicotine yields and the testing results were published in the Federal Register. *DSUF* at ¶ 39, 52; *POSMF* at ¶ 52. However, the FTC never formally adopted the FTC method. *POSMF* at ¶ 37.

In 1970, the FTC once again published notice of a proposed trade regulation regarding "advertising of cigarettes", which was never enacted. The regulation would have required the tobacco companies to disclose in their advertising the tar and nicotine content of their cigarettes as measured by the FTC Method, but again did not specifically reference "Lights" cigarettes or the descriptor "lowered tar and nicotine". *Pls.' Statement of Additional Mat. Facts* at ¶¶ 10-12 (Docket # 51)(PSAMF); *Def.'s Resp. to Pls.' Statement of Additional Mat. Facts* at ¶¶ 11-12 (Docket # 55)(DRPSAMF); *DSUF* at ¶ 53. The FTC informed manufacturers that in lieu of rulemaking, it would accept an agreement from them, and, as a result, the tobacco companies voluntarily undertook to disclose such claims and to use the FTC Method. *DSUF* at ¶¶ 54-55; *POSMF* at ¶¶ 54-55; *PSAMF* at ¶ 15; *DRPSAMF* at ¶ 15. This agreement did not refer to the use of the specific descriptors at issue here. *POSMF* at ¶ 55. The FTC reminded companies that it retained the right to reinstitute rulemaking procedures at any time if necessary, and in turn the companies challenged FTC's ability to promulgate the rule in the first place, characterizing it as a voluntary program. *DSUF* at ¶ 56; *POSMF* at ¶ 56; *PSAMF* at ¶¶ 16-17; *DRPSAMF* at ¶¶ 16-17. The FTC classified its testing regime as "regulatory activity" when reporting to Congress in 1970. *DSUF* at ¶¶ 41, 57; *POSMF* at ¶¶ 41, 57.

The FTC closed its testing lab in 1987. *DSUF* at ¶ 42; *POSMF* at ¶ 42. Since then, companies themselves have reported their test results to the FTC, which publishes them in the Federal Register each year. *DSUF* at ¶¶ 43, 52, 59; *POSMF* at ¶¶ 43, 52. The FTC

may inspect testing facilities. *DSUF* at ¶ 44; *POSMF* at ¶ 44. But, companies are not required to test and report pursuant to the FTC Method either by law or regulation.[8] *PSAMF* at ¶¶ 19, 24, 26; *DRPSAMF* at ¶¶ 19, 24, 26.

The FTC was aware of certain limitations of the test, including that it could not accurately measure how much tar and nicotine a human smoker would receive from any particular cigarette. *DSUF* at ¶¶ 45-47; *POSMF* at ¶¶ 45, 47; *PSAMF* at ¶ 19; *DRPSAMF* at ¶ 19. Indeed, Philip Morris, among others, cautioned the FTC that a single, uniform testing method could not account for the many variations in human smoking habits. *DSUF* at ¶ 45; *POSMF* at ¶ 45. By 1978, the public health community and the FTC concluded that some "light" cigarette smokers engaged in "compensatory behavior": changing the way they smoked to ensure no actual reduction of tar and nicotine. Examples of compensatory behavior include unconsciously covering invisible "ventilation holes" in the filter paper, smoking the cigarettes more intensely, inhaling more deeply, and holding the smoke in the lungs for a longer time period. *DSUF* at ¶¶ 62-64; *POSMF* at ¶¶ 62-64. In light of this conclusion, the FTC investigated whether to change the FTC Method; however, even after this problem was brought to its attention, the FTC did not advocate a new testing method. *DSUF* at ¶¶ 65-67; *POSMF* at ¶¶ 65-67. In 1978, the FTC issued an advisory opinion directing Lorillard Tobacco Company (and by implication other companies who had signed on to the voluntary disclosure agreement) not to use any tar figures other than those obtained through the FTC method. *DSUF* at ¶¶ 58, 67; *POSMF* at ¶¶ 58, 67.

In 1981, in response to complaints from other cigarette companies regarding a Brown & Williamson brand, the FTC investigated assertions that the FTC Method was itself

---

[8] High-ranking FTC officials admitted as much at a 1987 congressional hearing. *Id.*

deceptive because it did not measure the actual amount of tar and nicotine ingested by smokers. *DSUF* at ¶¶ 68-69; *POSMF* at ¶ 68. As part of its investigation, the FTC consulted experts in the smoking and health field and considered different methods of measuring tar and nicotine. *DSUF* at ¶ 70. That investigation and subsequent litigation led to a specific prohibition against Brown & Williamson use of FTC results because their filter design "fooled" the FTC machine. *DSUF* at ¶¶ 68, 71-72; *POSMF* at ¶¶ 68, 72. No regulatory action has been brought against any other cigarette company regarding similar conduct; nor was the use of the descriptor "ultra low" challenged in the case against Brown & Williamson. *DSUF* at ¶¶ 73-74; *POSMF* at ¶¶ 73-74. After the Brown & Williamson case, the FTC published notice in the Federal Register seeking public comment as to whether the testing method should be altered. *DSUF* at ¶ 75. However, it never promulgated any rules. *POSMF* at ¶ 75. The cigarette companies continue to comply voluntarily with the FTC Method. *POSMF* at ¶ 76.

Although compliance remains voluntary, the FTC Method is supported by epidemiologic studies which found that reducing tar yields as measured by the FTC Method provided a measure of tar and nicotine yields that reduced the risk of disease. *DSUF* at ¶¶ 51, 79, 80; *POSMF* at ¶¶ 79-80. It also allows for uniform comparison among companies and is "capable of being presented to the public in a manner that is readily understandable". *DSUF* at ¶¶ 40, 48, 77-78; *POSMF* at ¶¶ 40, 48, 77-78. The FTC considered that a uniform test would stimulate competition among manufacturers, and continues to rely on the forces of competition, at least in part, to regulate cigarette advertising. *DSUF* at ¶ 50; *POSMF* at ¶ 50; *PSAMF* at ¶ 25; *DRPSAMF* at ¶ 25. The

FTC has also been purportedly unable to identify a viable alternative. *DSUF* at ¶ 77; *POSMF* at ¶ 77.

### e.   FTC: Lights and Lowered Tar & Nicotine

In 1966, the FTC lifted its 1959 "ban" on substantiated factual statements of tar and nicotine content, but not as to "collateral representations" regarding reduction or elimination of health hazards. *DSUF* at ¶ 81; *POSMF* at 81. In the confusion that followed the lifting of the "ban", the FTC, in an internal memorandum and in a letter to the National Association of Broadcasters, stated that as a general rule it would not challenge representations relating to "low" tar and nicotine content when such representations were shown to be accurate and fully substantiated by tests conducted in accordance with the standardized testing methods and procedures used by the FTC and the basis of comparison was fully and fairly stated. *DSUF* at ¶¶ 82-85; *POSMF* at ¶¶ 84-85. Still, no regulatory action was taken, although the letter's content was described by the FTC as a "policy statement". *POSMF* at ¶ 85; *DSUF* at ¶ 86. The FTC has defined "low tar" as 15.0 mg. or less tar, but has not defined any other similar descriptor. *DSUF* at ¶ 87; *POSMF* at ¶ 87. In 1969, an enforcement action against the American Tobacco Company a/k/a American Brands resulted in a consent decree prohibiting American Tobacco from advertising that it had reduced tar levels if it did not disclose the precise content and restricting improper comparisons to other brands. *DSUF* at ¶¶ 88-89; *POSMF* at ¶¶ 88-89.[9] The action was disclosed under "regulatory activity" in a 1971 Report to Congress. *DSUF* at ¶ 90; *POSMF* at 90.

---

[9] Plaintiffs argue the action did not involve the specific descriptors in this case: "Lights" and "lowered tar and nicotine". *POSMF* at ¶¶ 88-89. However, the complaint referenced American Tobacco Company's use of the terms "lower in tar" and other statements "of similar import". *Compl. In the Matter of Am. Tobacco Co.* at ¶ 4 (Docket # 21 - Def. Exh. 249). Furthermore, the consent order required American

The FTC has reviewed the propriety of certain terms to describe cigarettes measuring lower in tar and nicotine several times since the 1970s.[10]  As a result, the FTC indicated that the descriptors are not forbidden and are not unfair or deceptive (at least if not unsubstantiated), although the FTC has also not imposed any actual regulations covering use of the terms.  *DSUF* at ¶¶ 91-95; *POSMF* at ¶¶ 91-95.[11]

Congress held hearings on low tar cigarettes in 1987 following the closure of the FTC testing lab.  *DSUF* at ¶¶ 96-97.  In 1988, an act proposing the repeal of FCLAA's preemption provision to "make the tobacco companies liable for misrepresentation, false advertising, and other breach of warranties" was introduced in the United States House of Representatives.  *DSUF* at ¶ 98.  Its sponsor claimed that advertisements for low tar cigarettes were deceptive because they implied that smoking cigarettes was safer without any supporting medical evidence.  *DSUF* at ¶ 99.  The proposed bill would have permitted states to require more stringent warnings than federal law requires, allowing states to neutralize such deceptive advertisements.  *DSUF* at ¶ 100.  The FTC opposed this proposed bill, because it was concerned that if FCLAA did not preempt state law, states would be allowed to require additional and/or inconsistent warnings which would make it difficult if not impossible to advertise on a national basis.  *DSUF* at ¶¶ 101-102; *POSMF* at ¶¶ 101-102.

---

Tobacco to cease and desist from "stating in advertising that any cigarette manufactured by it…is low or lower in 'tar' by use of the words 'low', 'lower', and 'reduced' or like qualifying terms, unless the statement is accompanied by a clear and conspicuous disclosure of: (1) the 'tar' and nicotine content…." *Decision and Order In the Matter of Am. Tobacco Co.* at 2 (Docket # 21 - Def. Exh. 255)(emphasis supplied).  This Court does not consider the descriptors in this case as outside the range contemplated in the American Tobacco Company Order, even if they are not precisely the same.

[10] These reviews occurred in 1992, at the behest of a consumer group; in 1997, when the FTC formally sought public comments; and, in 1998, at the behest of Senator Lautenberg.  *DSUF* at ¶¶ 91-93.

[11] In 1995, another consent decree with the American Tobacco Company was issued, concerning brand comparisons.  In it, the FTC indicated that the presentation of tar and nicotine ratings of two brands, made for comparative purposes, was not by itself improper, with or without representations that a brand is "low" or "lower", so long as no more than a single cigarette or pack of one brand is visually depicted versus a single cigarette or pack of any other brand.  *DSUF* at ¶ 91; *POSMF* at ¶ 91.

### f.  Philip Morris

Philip Morris began marketing Marlboro Lights cigarettes in 1971 and Cambridge Lights in 1986.  *DSUF* at ¶ 103.  These brands must carry the same Surgeon General's warnings as "full flavor" cigarettes.  *DSUF* at ¶ 104; *POSMF* at ¶ 104.  It used "Lights" to advertise both brands, and "lowered tar and nicotine" to advertise and promote Marlboro Lights.  *PSAMF* at ¶ 6; *DRPASMF* at ¶ 6.  These descriptors are based on FTC Method test results.  *DSUF* at ¶ 105; *POSMF* at ¶ 105.  Philip Morris knew that a single uniform testing method, such as the FTC Method, could not account for the variations in human smoking habits.  *DSUF* at ¶ 45; *POSMF* at ¶ 45; *PASMF* at ¶ 22; *DRPASMF* at ¶ 22.  At least one Philip Morris study conducted suggested that smokers often have a larger smoke intake on Marlboro Lights than on Marlboros.  *PASMF* at ¶ 8; *DRPASMF* at ¶ 8.  Philip Morris also knew that the FTC Method "gave low numbers".  *PASMF* at ¶ 21; *DRPASMF* at ¶ 21.  In 2001, the U.S. Department of Health and Human Services found that the tobacco industry knew that representations of cigarettes as "light" were inherently deceptive.  *PASMF* at ¶ 9; *DRPASMF* at ¶ 9.  Philip Morris has never, however, expressly stated that Marlboro Lights are less hazardous than full flavor cigarettes.  *DSUF* at ¶ 106; *POSMF* at ¶ 106.

In 2002, Philip Morris submitted a "Petition for Rulemaking to the FTC" in response to an FTC question regarding whether there was a need for official guidance with respect to the terms used in marketing lower rated cigarettes, requesting action in light of recent scientific developments.  *PSAMF* at ¶¶ 29-30; *DRPSAMF* at ¶¶ 29-30.  In 2005, Philip Morris presented a FDA Position statement supporting legislation for FDA regulation of

tobacco, including authority for the FDA to regulate or ban terms such as "light" or "low tar".  *PSAMF* at ¶ 28; *DRPSMF* at ¶ 28.

## II.    Discussion

### a.  Standard of Review

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  The First Circuit has defined "material" to mean "a contested fact has the potential to change the outcome of the suit under the governing law if the dispute over it is resolved favorably to the nonmovant."  *McCarthy v. Nw. Airlines, Inc.* 56 F.3d 313, 315 (1st Cir. 1995).  It has defined "genuine" as "the evidence about the fact is such that a reasonable jury could resolve the point in favor of the nonmoving party."  *Id*.  The burden on the moving party may be discharged by demonstrating an absence of evidence to support the nonmoving party's case.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The court is obligated to view the entire record "in the light most flattering to the nonmovant" and indulge "all reasonable inferences in that party's favor."  *Cadle Co. v. Hayes*, 116 F.3d 957, 959 (1st Cir. 1997).

### b.  Pre-emption

Since *McCulloch v. Maryland*, 17 U.S. 316 (1819), it has been "settled that state law that conflicts with federal law is 'without effect'".  *Cipollone v. Liggett Group*, 505 U.S. 504, 516 (1992)(quoting *Maryland v. Louisiana,* 451 U.S. 725, 746 (1981)).  In *Gibbons v. Ogden*, 22 U.S. 1 (1824), Chief Justice Marshall wrote that the Supreme Clause[12] of

---

[12] "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land,; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI, cl. 2.

the United States Constitution requires that state laws which "interfere with, or are contrary to the laws of Congress, made in pursuance of the constitution…," are preempted and, therefore, invalid. *Id.* at 211. The First Circuit has said that this "verity remains firmly embedded in our modern jurisprudence." *Greenwood Trust Co. v. Massachusetts*, 971 F.2d 818, 822 (1st Cir. 1992). Pre-emption "may result not only from action taken by Congress itself; a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation." *Global NAPS, Inc. v. Verizon New Eng., Inc.,* 44 F.3d 59, 71 (1st Cir. 2006)(quoting *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369 (1986)).

To determine whether state law should be pre-empted, courts distinguish between express and implied pre-emption. *Grant's Dairy - - Maine, LLC v. Comm'r of Me. Dep't of Agric.*, 232 F.3d 8, 15 (1st Cir. 2000); *Greenwood*, 971 F.2d at 822. Express pre-emption occurs only when a federal statute explicitly confirms Congress's intention to pre-empt state law and defines the extent of that preclusion. *Grant's Dairy,* 232 F.3d at 15. In this context, when "'Congress has unmistakably…ordained'…that its enactments alone are to regulate a part of commerce, state laws regulating that aspect of commerce must fall." *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977)(quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142 (1963)). *See also New Hampshire Motor Transp. Ass'n v. Rowe,* No. 05-2136, 2006 U.S. App. LEXIS 12264, *18-*19 (1st Cir. May 19, 2006)(citation omitted). In every pre-emption case, the "purpose of Congress is the ultimate touchstone." *Id.* at *19 (citing *Medtronic, Inc. v. Lohr,* 518 U.S. 470, 485 (1996)).

Pre-emption is "not to be lightly presumed".  *Cal. Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 281 (1987).  *See also New York State Conference of Blue Cross & Blue Shield Plans v. Travelers' Ins. Co.,* 514 U.S. 645, 654 (1995)("despite the variety of these opportunities for federal preeminence, we have never assumed lightly that Congress has derogated state regulation, but instead have addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law").  Moreover, consumer protection is "a subject[ ] over which the states have traditionally exercised their police powers." *Alliance of Auto. Mfrs. v. Gwadosky*, 430 F.3d 30, 43 (1st Cir. 2005)(quoting *Greenwood*, 971 F.2d at 828).  And when Congress legislates in a field which the states have traditionally occupied, this Court begins with "the assumption that the historic police powers of the States were not to be superseded by [federal law] unless that was the clear and manifest purpose of Congress".  *Pac. Gas & Elec. v. Energy Res. Comm'n,* 461 U.S. 190, 206 (1983)(quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230 (1947)); *Grant's Dairy,* 232 F.3d at 14-15.  Even so, though in the area of consumer protection law any "preemption provision must be construed cautiously and with due regard for state sovereignty…it does not serve as a buckler against the force of the Supremacy Clause".  *Greenwood,* 971 F.2d at 828.[13]

In FCLAA, Congress recognized that "diverse, nonuniform, and confusing cigarette labeling and advertising regulations" impede commerce and the national economy.  15 U.S.C. § 1331; *Lorillard Tobacco Co. v. Reilly,* 533 U.S. 525, 542-43 (2001).  To avoid

---

[13] In *Rowe*, the First Circuit recently discussed whether a pre-emption analysis should start with a presumption against pre-emption where the state law was enacted pursuant to its police power interest. *Rowe,* 2006 U.S. App. LEXIS 12264 at *19 n.10.  *Rowe* acknowledged that the "circumstances in which the presumption is to apply are not altogether clear." *Id.*  However, unlike *Rowe* where the parties devoted "a great deal of argument" to the issue, *id.,* Philip Morris has not argued that the presumption should not apply, despite Plaintiffs' raising the issue.  *See Pls.' Opp'n* at 16-17.

this specter of confusion, Congress prescribed the specific language of the Surgeon General's health warnings that must appear on all cigarette packages and in cigarette advertisements.  *See* 15 U.S.C. § 1333.  Further, pursuant to FCLAA's two-pronged pre-emption provision, found in 15 U.S.C. § 1334, Congress "unequivocally precludes the requirement of any additional statements on cigarette packages beyond those provided in § 1333," and "precludes States or localities from imposing any requirement or prohibition based on smoking and health with respect to the advertising or promotion of cigarettes." *Reilly,* 533 U.S. at 542.  At the same time, Congress declared that "nothing in this Act…(other than the requirements of section 4 [15 U.S.C. § 1333]) shall be construed to limit, restrict, expand, or otherwise affect the authority of the Federal Trade Commission with respect to unfair or deceptive acts or practice in the advertising of cigarettes".  15 U.S.C. § 1336.

Philip Morris argues that Plaintiffs:

> [W]ould have this Court substitute its judgment for that of Congress and the FTC by applying state law either to require that PM USA provide additional health information about Marlboro Lights and Cambridge Lights or to prohibit the use of the terms "lights" and "lowered tar and nicotine" in cigarette labeling and advertising in Maine – and only in Maine.  Imposing liability on plaintiffs' claims, therefore, under any legal theory, would necessarily create state law requirements or prohibitions with respect to cigarette advertising and promotion that are at odds with Congress's comprehensive federal scheme governing the advertising and promotion of cigarettes.

*Def.'s Mot.* at 14 (emphasis in original).[14]  Plaintiffs rely on *Cipollone* to argue their claims are fraudulent-misrepresentation claims, not pre-empted by FCLAA.  *Pls.' Opp'n*

---

[14] It is useful at the outset to dispose of two preliminary matters.  First, the predicate legal duty created by Plaintiffs' claims constitutes a "requirement or prohibition" under state law – and Plaintiffs do not appear to challenge this point, *see Def.'s Reply* at 7.  Plaintiffs' prayer for relief requests an award of damages as well as "such injunctive relief as may be appropriate in the circumstances".  *First Am. Compl.*  (However, expressly disclaimed is any claim for damages for personal injuries.  *Id.* at ¶ 4).  In *Cipollone*, the Supreme Court, in a plurality opinion, noted that common-law damages actions impose forbidden "requirements or prohibitions" within the scope of 15 U.S.C. § 1334.  "[State] regulation can be as effectively exerted

at 17-19.  In reply, Defendant characterizes Plaintiffs' claims not as express fraud, but as "warning neutralization" or failure to warn – both expressly held pre-empted by *Cipollone*.  *Def.'s Mot.* at 19; *Def.'s Reply* at 1-2, 8.  To resolve the question, a close examination of the *Cipollone* opinion is needed.

### i.  The *Cipollone* Conundrum

Much of the clarity and confusion that surrounds tobacco litigation can be traced to *Cipollone*, a 1992 Supreme Court decision.  *Cipollone* arose from conflicts among lower courts about the extent federal tobacco law pre-empted state law claims.  Perceiving "the manifest importance of the issue", the Court undertook "to resolve the conflict".  *Cipollone*, 505 U.S. at 509.  Unfortunately, the Court issued a somewhat fractionalized opinion, clarifying some issues while raising new ones, to the extent that now, nearly fourteen years later, courts remain divided about what the decision means and how to apply it.[15]  As if to prove the point, here both parties extensively cite *Cipollone* as plausibly supporting their opposing positions.  *Cipollone*'s distinctions, though clear in theory, defy clear application.

*Cipollone* made at least two points.[16]  After reviewing the 1965 and 1969 Acts, it concluded that their "pre-emptive scope" was "governed entirely by the express language in § 5…."  *Id.* at 517.  It ruled that there was "'no need to infer congressional intent to

---

through an award of damages as through some form of preventative relief.  The obligation to pay compensation can be, indeed is designed to be, a potent method of governing conduct and controlling policy."  505 U.S. at 521 (citations omitted).

    Second, the claims here concern "advertising or promotion".  *See Def.'s Mot.* at 17.  While it may not necessarily be true, as Defendant claims, that "every communication between a cigarette manufacturer and consumers" is advertising or promotion within the meaning of FCLAA, *see Rivera v. Philip Morris, Inc.,* 395 F.3d 1142, 1149 (9th Cir. 2005); *Philip Morris, Inc. v. Harshbarger,* 122 F.3d 58 (1st Cir. 1997), nevertheless Plaintiffs concede that the claims here concern advertising.  *See Pls.' Opp'n* at 19.

[15] Justice Stevens wrote for the majority in parts I, II, III and IV, but only three other justices joined his opinion in Parts V and VI.  Justice Blackmun filed an opinion concurring in part, concurring in the judgment in part, and dissenting in part, joined by Justices Kennedy and Souter; Justice Scalia filed an opinion concurring in the judgment in part and dissenting in part, joined by Justice Thomas.

[16] These points are in Parts III and IV, both portions of the opinion which commanded a majority.

pre-empt state laws from the substantive provisions' of the legislation", because Congress had enacted a "provision explicitly addressing that issue, and…that provision provides a 'reliable indicium of congressional intent with respect to state authority'."[17]  *Id.* (citations omitted).  Second, addressing § 5 in the 1965 Act,[18] *Cipollone* found that Congress had spoken "precisely and narrowly" and "merely prohibited state and federal rulemaking bodies from mandating particular cautionary statements on cigarette labels…or in cigarette advertisements…."  *Id.* at 518.

When it turned to § 5 of the 1969 Act,[19] however, the majority melted to a plurality. Justice Stevens wrote that the "plain language of the pre-emption provision in the 1969 Act is much broader."  *Id.* at 520.  First, it bars "not simply 'statements' but rather 'requirements or prohibitions…imposed under State law.'  Second, the 1969 Act reaches beyond statements 'in the advertising' to obligations 'with respect to the advertising or promotion' of cigarettes."  *Id.*  To evaluate the sweep of the 1969 Act, *Cipollone* stated

---

[17] As explained in *Freightliner Corp. v. Myrick,* 514 U.S. 280 (1995), by so concluding, *Cipollone* did not "mean that the express clause entirely forecloses any possibility of implied pre-emption."  *Id.* at 288.  *See also Rowe,* 2006 U.S. App. LEXIS 12264 at *19 ("The primary focus is on the 'plain wording' of the statute because the text 'contains the best evidence of Congress' pre-emptive intent'…. But '[a]lso relevant is the structure and purpose of the statute as a whole as revealed…through the reviewing court's reasoned understanding of the way in which Congress intended the statute and its surrounding regulatory scheme to affect business, consumers and the law.'")(citations omitted).

[18] Captioned "Preemption", section 5 of the 1965 Act provided in part:

>    (a)  No statement relating to smoking and health, other than the statement required by section 4 of this Act, shall be required on any cigarette package.
>    (b)  No statement relating to smoking and health shall be required in the advertising of any cigarettes the packages of which are labeled in conformity with the provisions of this Act.

Federal Cigarette Labeling and Advertising Act, Pub. L. No. 89-92, 79 Stat. 283, as amended, 15 U.S.C. § 1334.

[19] The 1969 Act modified the pre-emption provision by replacing the original § 5(b) with a provision that reads:

>    (b)  State Regulations.  No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act

Public Health Cigarette Smoking Act, Pub. L. No. 91-222, 84 Stat. 87, as amended, 15 U.S.C. § 1334; *Cipollone*, 505 U.S. at 515.

that "the appropriate inquiry is not whether a claim challenges the 'propriety' of advertising and promotion, but whether the claim would require the imposition under state law of a requirement or prohibition based on smoking and health with respect to advertising or promotion." *Id.* at 525. The Court proceeded through each state law claim and ruled on whether and the extent to which each was pre-empted:[20]

*Failure to Warn*: *Cipollone* said that to the extent the state law claim relies on a "requirement or prohibition...with respect to...advertising or promotion", it is pre-empted. *Id.* at 524. In other words, if claims require a showing that Defendant's advertising or promotions should have included additional, or more clearly stated, warnings, these claims are pre-empted. *Id*. However, to the extent the state law claim relies "solely on [the defendant's] testing or research practices or other actions unrelated to advertising or promotion", it is not. *Id.* at 524-25.

*Fraudulent Misrepresentation*: *Cipollone* described two fraudulent misrepresentation theories:  one pre-empted; one not. The first involved an allegation that the tobacco companies "through their advertising, neutralized the effect of federally mandated warning labels", by, for example, minimizing the health hazards associated with smoking. *Id.* at 527. This *Cipollone* found pre-empted, because it was "merely the converse of a state-law <u>requirement</u> that warnings be included in advertising and promotional materials." *Id.* (emphasis in original). It is "inextricably related" to the failure-to-warn theory. *Id.* at 528.

The second theory alleged "intentional fraud and misrepresentation both by 'false representation of a material fact [and by] concealment of a material fact.'" *Id.* at 528.

---

[20] This Court describes only those portions of *Cipollone* that address causes of action touching upon the theories Plaintiffs are pursuing.

Such a claim is not pre-empted, even if the allegedly fraudulent statements appear in advertisements. *Id.* at 528-29. *Cipollone* reasoned that such claims are "predicated not on a duty 'based on smoking and health' but rather on a more general obligation - - the duty not to deceive." *Id*. The justification for the distinction is that "unlike state-law obligations concerning the warning necessary to render a product 'reasonably safe', state-law proscriptions on intentional fraud rely only on a single, uniform standard: falsity". *Id.* at 529. It is this final theory that Plaintiffs argue applies, *see Pls.' Opp'n* at 19, while Defendant argues that Plaintiffs' assertions comprise failure-to-warn or warning neutralization claims. *Def.'s Mot.* at 19-24.

### ii.   The Crux of the Complaint

Plaintiffs claim that "Defendants engaged in a course of unfair and/or deceptive business practices in connection with the design, manufacture, distribution, promotion, marketing and sale of Marlboro Lights cigarettes by:

a. Falsely and/or misleadingly representing that their product is "light" and/or delivers lowered tar and nicotine in comparison to regular cigarettes;

b. Describing the product as light when the so-called lowered tar and nicotine deliveries depended on deceptive changes in cigarette design and composition that dilute the tar and nicotine content of smoke per puff as measured by the industry standard testing apparatus, but not when used by the consumer;

c. Intentionally manipulating the design and content of Marlboro Lights and Cambridge Lights cigarettes in order to maximize nicotine delivery while falsely and/or deceptively claiming lowered tar and nicotine. These manipulations include, but are not limited to, the modification of tobacco blend, weight, rod length, and circumference; the use of reconstituted tobacco sheets and/or expanded tobacco; and the increase of smoke pH levels by chemical processing and additives, such as ammonia, which resulted in the delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendants represent by use of the "light" description; and

d. Employing techniques that purportedly reduce machine-measured levels of tar and nicotine in Marlboro Lights and Cambridge Lights cigarettes, while actually increasing the harmful biological effects, including mutagenicity (genetic and chromosomal damage) caused by the tar ingested by the consumer per milligram of nicotine."

*First Am. Compl.* at ¶ 34.[21]  More generally, Plaintiffs allege Defendants engaged in acts of fraudulent concealment, which provide the basis for its asserted violations of Maine's UTPA and its claim of unjust enrichment.

### iii.   Children of *Cipollone*

If there is indeed anything new under the sun, tobacco litigation is not it.  This precise question, express pre-emption of claims of deception regarding "lights" cigarettes, has generated controversy across this country.  Three decisions are particularly helpful to Defendant: *Reilly*; *Dahl v. R.J. Reynolds Tobacco Co.,* No. MP 03-5582, 2005 WL 1172019 (Minn. Dist. Ct. May 11, 2005) and *In re Tobacco Cases II,* No. JCCP 4042, 2004 WL 2445337 (Cal. Super. Aug. 4, 2004).[22]

---

[21] Elsewhere, the list of alleged deceptive acts and practices reads somewhat differently, but is essentially the same:

   a.  Falsely and/or misleadingly representing that their product is "light" and/or delivers "lowered tar and nicotine" in comparison to regular cigarettes;

   b. Designing cigarettes to register lowered tar and nicotine levels under machine testing conditions while actually delivering higher levels of these compounds when smoked by consumers, thereby rendering the "light" product descriptor deceptive and misleading;

   c. Placing ventilation holes on the filter of light cigarettes that are covered or blocked by the smoker's lips or fingers under normal use, thereby negating the represented effects of the light brand;

   d. Manipulating the nicotine levels in their light cigarettes;

   e. Employing techniques that purportedly reduce machine-measured levels of tar in their Marlboro Lights and Cambridge Lights cigarettes, including increased air dilution through the use of ventilation holes in or near the filter, but which actually increase the mutagenicity (genetic and chromosomal damage) of tar delivered to the consumer and thereby increase the level of harmful toxins per milligram of nicotine delivered to the consumer; and,

   f. Manipulating the design of their Marlboro Lights and Cambridge Lights cigarettes, including but not limited to, modifying the tobacco blend, weight, rod length and circumference; using reconstituted tobacco sheets and/or expanded tobacco; increasing smoke pH levels by chemical processing and additives, such as ammonia, in such a way that resulted in delivery of greater amounts of tar and nicotine when smoked under actual conditions than Defendants represent by use of the "light" product descriptor.

*Id*. at ¶ 54.

[22] Four more, relied on by Defendant, are less helpful.  In *Watson v. Philip Morris Cos., Inc.*, 420 F.3d 852 (8th Cir. 2005), the Eighth Circuit addressed whether a light cigarette class action could be removed to federal court under the federal officer removal statute.  The statutory and policy considerations on whether federal courts should exercise jurisdiction are distinct from concerns raised by a motion for summary judgment on pre-emption grounds, but the Eighth Circuit concluded that in agreeing to the FTC Method

In *Reilly*, the United States Supreme Court addressed an appeal from the First Circuit, concerning regulations the Massachusetts Attorney General had promulgated governing the advertising and sale of cigarettes, smokeless tobacco, and cigars.  533 U.S. at 532.  A group of tobacco companies claimed the state regulations violated federal law and the United States Constitution.  *Id.*  Distinguishing between regulation of content, which

---

test, Philip Morris was "'acting under' the direction of a federal officer" – a conclusion of some tangential applicability here. *Id.* at 859.

   *Newton v. R.J. Reynolds Tobacco Co.*, No. C-02-1415 VRW, slip op. (N.D. Cal. 2003)(Docket # 21 – Attach. 5 ("Tab A")), dealt with the plaintiffs' attempt to amend their complaint to "include false and misleading advertising claims" regarding "light", "low-tar", and "low-nicotine" cigarettes. *Id.* at *11. *Newton* is distinguishable on two grounds. First, it is factually distinguishable because the *Newton* plaintiffs were not purchasers or users of such products and could not show any harm. *Id.* at *12. Second, *Newton* does not discuss *Cipollone*'s exemption for fraud based on intentional misstatement – *Cipollone* is not cited at all.

   Philip Morris cites *Johnson v. Brown & Williamson Tobacco Corp.*, 122 F. Supp. 2d 194 (D. Mass. 2000) for holding that an implied warranty of fitness for a particular purpose claim (i.e. that Defendant should have known that decedent relied on its expertise in creating safe tobacco products) was pre-empted. *See id.* at 203; *Def.'s Mot.* at 22. *Johnson* also held, however, that the claim that Brown & Williamson had breached its implied warranty of merchantability because the cigarettes were defectively designed in several respects, including insufficient reduction in tar and other carcinogens, was not pre-empted. 122 F. Supp. 2d at 202. Furthermore, in holding the fraud claim was not pre-empted, *Johnson* construed the complaint as alleging that "B&W made intentional misrepresentations and false statements of material fact in its advertising and promotional material". *Id.* at 203. This result is consistent with *Cipollone*'s holding that "the 1969 Act does not preempt claims of intentional fraud and misrepresentation based on false representations and concealment of material fact, <u>even if the allegedly fraudulent statements were made in advertisements or promotions</u>…" *id.* at 203 (citing *Cipollone*, 505 U.S. at 528-29)(emphasis supplied). *See also Glassner v. R.J. Reynolds Tobacco Co.*, 223 F.3d 343, 348 (6th Cir. 2000).

   *Flanagan v. Altria Group, Inc.*, No. 05-71697, 2005 WL 2769010 (E.D. Mich. Oct. 25, 2005), provides more useful support for Philip Morris. In *Flanagan*, involving nearly identical allegations against these same defendants, the Court held the case was exempt under the Michigan Consumer Protection Act. Determining that the conduct at issue had been impliedly authorized by the FTC, Judge Edmunds noted: "The FTC's regulatory scheme is not the only possible source of federal authorization…Under the FCLAA, Congress mandated that all cigarettes and cigarette advertisements contain certain health warnings, which have taken the form of the now-familiar SURGEON GENERAL'S WARNING labels found on tobacco products and advertisements. Furthermore, in an effort to ensure uniformity, Congress pre-empted governmental rulemaking bodies from prescribing additional warnings. A 1969 amendment to the FCLAA expanded the preemption provision…." *Id.* at *6.

   Supplementing this quartet is a slew of additional cases, not heavily relied on by Philip Morris and distinguishable as Plaintiffs posit, *see Pls.' Opp'n* at 24-25 – but which collectively provide some (albeit limited) support for Defendant's position.  *See Spain v. Brown & Williamson Tobacco Corp.,* 363 F.3d 1183 (11th Cir. 2004); *Boerner v. Brown & Williamson Tobacco Corp.,* 260 F.3d 837 (8th Cir. 2001); *Brown v. Philip Morris, Inc.,* 250 F.3d 789 (3d Cir. 2001); *Kirksey v. R.J. Reynolds Tobacco Co.,* 168 F.3d 1039, 1042-43 (7th Cir. 1999); *Am. Tobacco Co. v. Grinnell,* 951 S.W.2d 420 (Tex. 1997); *Hill v. R.J. Reynolds Tobacco Co.,* 44 F. Supp. 2d 837 (W.D. Ky. 1999); *Appavoo v. Philip Morris, Inc.,* No. 122469/97, 1998 WL 440036 (N.Y. Sup. Ct. July 24, 1998); *Geiger v. Am. Tobacco Co.,* 674 N.Y.S.2d 775 (N.Y. App. Div. 1998); *Peel v. R.J. Reynolds Tobacco Co.,* No. 1:98-CIV-2426-TWT, 1999 U.S. Dist. LEXIS 22691 (N.D. Ga. Apr. 30, 1999); *Small v. Lorillard Tobacco Co.,* 679 N.Y.S.2d 593 (N.Y. App. Div. 1998); *Lacey v. Lorillard Tobacco Co., Inc.,* 956 F. Supp. 956 (N.D. Ala. 1997).

would be pre-empted, and regulation of location, which would not, the First Circuit concluded the state regulatory scheme was not pre-empted by the FCLAA.  *Id.* at 538-39. The Supreme Court reversed on pre-emption.  After examining the language of the FCLAA's pre-emption provision,[23] *Reilly* states that Congress "unequivocally precludes the requirement of any additional statements on cigarette packages beyond those provided in § 1333."  533 U.S. at 542.  The Court described section 1334(b) as "more expansive", employing "far more sweeping language to describe the state action that is pre-empted."  *Id.*  After reviewing the history of federal regulation of the tobacco industry, *Reilly* observed that the former statute, enacted in 1965, had prevented only statements in advertising, but that the amended provision of the 1969 Act reaches all "requirements or prohibitions" imposed under state law "with respect to the advertising or promotion of cigarettes."  *Id.* at 545.  *Reilly* concluded that "Congress expanded the pre-emption provision with respect to the States, and at the same time, it allowed the FTC to regulate cigarette advertising."  *Id.*  at 545-46.

Massachusetts argued its regulations were not based on smoking and health, because they did not involve health-related content in cigarette advertising but instead counteracted youth exposure to cigarette advertising.  533 U.S. at 547.  *Reilly* analyzed whether the state scheme could be separated from the congressional concern for cigarette smoking and health and concluded it could not:  "At bottom, the concern about youth exposure to cigarette advertising is intertwined with the concern about cigarette smoking and health.  Thus the Attorney General's attempt to distinguish one concern from the other must be rejected."  *Id.* at 548.  *Reilly* concluded:  "In this case, Congress enacted a comprehensive scheme to address cigarette smoking and health in advertising and pre-

---

[23] 15 U.S.C. § 1334.

empted state regulation of cigarette advertising that attempts to address that same concern, even with respect to youth." *Id.* at 571.

Though not dispositive, *Reilly* reinforced the pre-emptive force of the FCLAA over state regulatory schemes that touch on cigarette advertising and promotion, emphasized that the FCLAA can pre-empt areas, such as zoning-type restrictions, that have traditionally been within the police power of the states,[24] and required an assessment as to the actual impact of the state regulation on smoking and health. In the process, the Court rejected a narrow construction of the pre-emption provision proposed by the Commonwealth.

*Dahl* concerned a claim for violation of the Minnesota Deceptive Trade Practices Act based on Defendant's "[r]epresenting in…advertisement" that their light cigarettes "confer[red] a health benefit to consumers". 2005 WL 1172019 at *10. Plaintiffs argued that their causes of action were valid under *Cipollone* because they alleged "not violations of the Labeling Act's proscription against requirements or prohibitions on advertising or promotion of cigarettes based on smoking and health but violations of deceptive trade statutes that prohibit 'lying'". *Id.* Finding that "the allegation in this case is that the state's statute regarding Deceptive Trade Practices imposes a duty to modify the labeling of the cigarettes because of representations based on smoking and health that arise out of the word 'Light', therefore deceiving consumers into believing that the cigarettes are not as bad for them as regular cigarettes", the Court concluded the claim was expressly pre-empted under FCLAA. *Id.* Similarly, *Dahl* found that an unjust

---

[24] The First Circuit reasoned that the Attorney General's regulations are a form of zoning, a traditional area of state power, and therefore the presumption against pre-emption applied. 533 U.S. at 546. The Supreme Court distinguished between generally applicable zoning regulations, which the FCLAA did not pre-empt, and regulations targeting cigarette advertising, which "squarely contradict[ ]…the FCLAA". *Id.* at 549-50.

enrichment claim based on Defendant's "falsely and deceptively advertising that the cigarettes were lights, or contained lowered Tar and Nicotine" had been pre-empted. *Id.* at *12. The allegation "imposes a duty under state law by creating an avenue for an award of damages based on Reynolds promotion of their 'Light' cigarettes as less unhealthy for the smokers than regular cigarettes" and "avoiding liability…would require complying with a state-imposed duty (through the award of damages that would follow a failure to comply) related to the promotion of cigarettes based on their relationship to smokers' health". *Id.*

In *In re Tobacco Cases II*, the Superior Court of California, San Diego County, held that the Plaintiffs' claim that "Defendants violated the UCL [Unfair Competition Laws, California Business & Professions Code] through their false and deceptive statements, advertisements and publications throughout the class period which were likely to mislead reasonable consumers regarding claimed 'Light' and 'Low Tar' cigarettes" was pre-empted. 2004 WL 2445337 at *19. Even though the Plaintiffs "adduced absolutely no evidence that the Defendants have ever <u>expressly</u> stated to the public, in advertisements or otherwise, that Light cigarettes are healthier", they argued that Defendants "willfully chose the term 'Light'…to take advantage of the popular meaning of the term, and the public's desire for a healthier cigarette." *Id.* at *20 (emphasis in original).

Even assuming this was true, the Superior Court reasoned that: "Plaintiffs must show that even if Lights have less tar and nicotine, they are not in fact healthier because the consumer may obtain <u>without being aware of it</u> as much tar and nicotine from Light cigarettes as from regular cigarettes. From this perspective, Plaintiffs' case of fraud by implication is essentially only a case of <u>potential</u> fraud by implication – an alleged fraud

that can only occur when smokers who mistakenly believe they are smoking a healthier cigarette by smoking Lights do not obtain the purported benefits of lower tar and nicotine". *Id.* (emphasis in original). Judge Prager then asked: "[H]ow can this happen?" *Id.*

The answer, according to Judge Prager, is the phenomenon of compensation. The Court noted that compensatory smokers include those who smoke more or who inhale more deeply and more frequently. *Id.* For these smokers to be misled, the Court posited that they would have to be unaware of the change in their smoking behavior. *Id.* at *20- *21.[25] Judge Prager also questioned whether smokers who had never smoked anything other than Lights could be misled, given that they cannot be said to be compensating. *Id.* at *21. He also opined that if Lights were not in fact lower in tar, the phenomenon of compensating would not exist, undermining the very crux of Plaintiffs' fraud case. *Id.*

The Superior Court summarized Plaintiffs' claim: "Defendants have violated the UCL by failing to warn the public that the "lightness" of Light cigarettes depends on the way they are smoked. While they insist that their Lights case does not depend on a finding of whether the Surgeon General's mandated warning is adequate, logic, as Mr. Spock would say, dictates otherwise. It dictates otherwise because it is obvious that Defendants' alleged deception…could easily be corrected by requiring an additional warning on the package to the effect that Light cigarettes can be more hazardous than regular cigarettes due to smoker compensation". *Id.* at *21. Thus, this was an inadequate warning case, expressly pre-empted under *Cipollone.*

---

[25] And, in the case of those who compensate by taking deeper or more frequent puffs rather than by simply smoking more, believe that the advertised tar and nicotine ratings are fixed (as is nutritional content in food) such that they do not vary depending on the manner or rate or consumption.

Plaintiffs, however, are not without legal support. *Sullivan v. Philip Morris USA, Inc.,* No. 03-796, 2005 WL 2123702 (W.D. La. Aug. 31, 2005) offers a different approach.[26]  In *Sullivan,* Plaintiffs pleaded redhibition pursuant to the Louisiana Civil Code,[27] breach of express and implied warranties based on Philip Morris' introducing and

---

[26] Plaintiffs cite several other cases in addition to *Sullivan,* which offer some support.  In *United States v. Philip Morris, Inc.,* 263 F. Supp. 2d 72 (D.C.D.C. 2003), a RICO case in which the tobacco industry was sued over its alleged "unlawful conspiracy to deceive the American public", including, *inter alia,* marketing "'light' or 'low tar/low nicotine' cigarettes as being less hazardous to smokers even though there is no basis for believing they are safer than other cigarettes".  *Id.* at 75.  Finding that the claims were "virtually identical to the claims held not preempted in *Cipollone*", *id.* at 80, the Court rejected Defendant's claim of pre-emption.  However, it is unclear whether the fraud at issue in *Philip Morris* had to do solely with the use of the "Lights" descriptors (as in the present matter), or whether there was any evidence in the record as to an affirmative advertising or marketing claim that "light" cigarettes are indeed safer to consumers (which would not be the case here) - and thus the case is of limited assistance.  *See id.* at 81 ("In fact, what the Government claims is that the Defendants knowingly misled consumers with advertisements that suggested, for example, that 'light' cigarettes were less hazardous.  The specific advertisements, which the Government claims were intentionally misleading, and which are the subject of these Motions, were certainly not mandated by the FTC").

In *Blue Cross & Blue Shield of New Jersey, Inc. v. Philip Morris, Inc.,* 113 F. Supp. 2d 345 (E.D.N.Y. 2000), Plaintiff included among its allegations of deceptive conduct that Defendant "misled the public to believe smoke from 'lighter' cigarettes contained reduced levels of tar and nicotine relative to that released by conventional cigarettes".  *Id.* at 359.  Relying on *Cipollone,* the Court allowed predicate acts pled under civil RICO and deceptive acts pled under the New York Consumer Protection Act based on "fraudulent concealment and nondisclosure of the health effects of cigarettes…made while defendants were falsely claiming in their advertisements and promotions that they were making and would make full disclosure" to proceed.  *Id.* at 387-88.  However, the record in *Blue Cross & Blue Shield* presents more damning evidence of fraud, nondisclosure, and affirmative misstatements with regard not only to "low tar and nicotine" cigarettes but also to other forms of deceptive conduct is present in this case.  *See id.* at 360-62.  *See also In re Simon II Litig.,* No. 00-CV-5332, 2002 U.S. Dist. LEXIS 25632 (E.D.N.Y. Oct. 22, 2002).

In *Falise v. Am. Tobacco Co.,* 94 F. Supp. 2d 316 (E.D.N.Y. 2000) a case involving the tobacco company's alleged "decades long campaign of misrepresentations, misinformation and intentional omissions", *id.* at 322, at the Eastern District of New York found that RICO and common-law fraud claims based on the duty not to deceive were exempted from pre-emption under *Cipollone*.  *Id.* at 356-57.  The focus of the *Falise* suit, however, was on "the unique health risks posed to those who both smoked and were occupationally exposed to asbestos" – not low tar and nicotine cigarettes.  *Id.* at 326.  *See also Izzarelli v. R.J. Reynolds Tobacco Co.,* 117 F. Supp. 2d 167, 170-72 (D. Conn. 2000)(complaint focused not on lights cigarettes but on the tobacco industry's misrepresentations about the health hazards of smoking in general and illegal youth marketing activities).

[27] Redhibition is a civil law action brought on account of some defect in a thing sold, seeking to void the sale on grounds that the defect renders the thing either useless or so imperfect that the buyer would not have originally purchased it.  *See* BLACK'S LAW DICTIONARY 1282 (7th ed. 1999).  The Louisiana Civil Code defines the warranty against redhibitory defects as follows:

The seller warrants the buyer against redhibitory defects, or vices, in the thing sold.

A defect is redhibitory when it renders the thing useless, or its use so inconvenient that it must be presumed that a buyer would not have bought the thing had he known of the defect. The existence of such a defect gives a buyer the right to obtain rescission of the sale.

A defect is redhibitory also when, without rendering the thing totally useless, it diminishes its usefulness or its value so that it must be presumed that a buyer would still have bought it but for a lesser price. The existence of such a defect limits the right of a buyer to a reduction of the price.

marketing light cigarettes intended to mislead consumers into believing light cigarettes were safer, intentional misrepresentations of the true effect of light cigarettes, and violations of Louisiana's Unfair Trade Practices and Consumer Protection Act. *Id.* at *3. Holding that the redhibition claim was not expressly pre-empted, Judge Trimble reasoned:

> Plaintiffs assert that Philip Morris manipulated nicotine levels by finding a way to "trick" the testing machines so that light cigarettes would show lower tar and nicotine levels, when in fact Philip Morris knew that humans smoking the cigarettes would consume similar nicotine levels as experienced from regular cigarettes. Philip Morris ignores the fact that instead of changing its labeling, it could possibly have designed a light cigarette that would actually deliver less tar and nicotine in the hands of a consumer. Plaintiffs cite *Wright v. Brooke Group Ltd., et al.,* [114 F. Supp. 2d 797 (N.D. Iowa 2000)] to support its position that post-1969 claims that the tobacco industry concealed facts are not preempted when a plaintiff alleges that the defendants "knowingly designed, manufactured and distributed a product which they knew was both carcinogenic and addictive and, thus, not fit for the ordinary purpose for which it was intended." [*Id.* at 828]. Plaintiffs are not asking Philip Morris to change its labeling. Plaintiffs are seeking an action in redhibition because the product itself was defective. The FTC method of testing gave lower tar and nicotine measurements than what each light cigarette actually delivered to a human smoker. Hence, the product was not reasonably fit for its intended purpose - to deliver lower tar and nicotine. Because this cause of action does not impose a requirement or prohibition based on smoking and health with respect to advertising or promotion, it is not preempted by the Labeling Act.

*Id.* at *6 (emphasis supplied).[28]  Buoyed by *Sullivan*, Plaintiffs argue in their brief that "Philip Morris would still have the option to honestly design and manufacture a cigarette that delivers lowered tar and nicotine, and is actually "light", if it is held liable under any theory". *Pls.' Opp'n* at 21 & n.14.[29]  At oral argument, when asked whether there was

---

La. Civ. Code Ann. art. 2520.

[28] Defendant notes that a request for reconsideration in *Sullivan* was pending at the time of its motion. *Def.'s Mot.* at 22-23 n.8.  The request was denied on December 2, 2005, and Judge Trimble signed a certificate of appealability.  *Order denying Corrected Mot. for Reconsideration re J. on Mot. for Summ. J. and granting Mot. for Certificate of Appealability, Sullivan v. Philip Morris,* No. 03-796 (W.D. La. Dec. 2, 2005).

[29] Defendant points out that this language referred to a redhibition claim, not asserted in this case. *Def.'s Mot.* at 22-23 n.8.  In the same breath, Philip Morris criticizes *Sullivan*, arguing that it "misapplied

any evidence in this record regarding *Sullivan*'s finding that the cigarette companies could have designed a light cigarette that was truly light, Plaintiffs' counsel characterized Judge Trimble's words as "rhetorical" and of "limited assistance" and conceded there is no evidence to that effect in this record.

### iv.   Conclusion

A pre-emption analysis must begin with the plain language of the statute, the best evidence of the "ultimate touchstone" of congressional intent. *Rowe*, 2006 U.S. App. LEXIS 12264 at * 19. Here, the pre-emptive language reads:

> (b) State Regulations.  No requirement or prohibition based on smoking and health shall be imposed under State law with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act

15 U.S.C. § 1334(b). The question is whether the Plaintiffs' claims would impose a requirement or prohibition under Maine law "with respect to the advertising or promotion of any cigarettes."

Plaintiffs have made a valiant attempt to tailor their claims to fit within the *Cipollone* exception for violations of the duty not to deceive; however, this Court concludes that they have failed. Facially the Plaintiffs draw support from *Cipollone*'s statement that "fraudulent-misrepresentation claims that do arise with respect to advertising and promotions (most notably claims based on allegedly false statements of material fact made in advertisements) are not pre-empted by § 5(b)." 505 U.S. at 528. After all, the Plaintiffs alleged that Philip Morris engaged in fraudulent concealment:  "...Defendants effectively, affirmatively, and fraudulently concealed from consumers of their products,

---

*Cipollone* in failing to focus on the substance of the claims rather than their labels." *Id.* This Court agrees with Philip Morris that the substance of the claim should be examined rather than simply its label, *cf. Dahl,* 2005 WL 1172019 at *10; which is why it agrees with Plaintiff that "the logic...[of *Sullivan*] applies with equal force" in this context. *Pls.' Opp'n* at 21 n.14.

28

including Plaintiffs, their knowing misrepresentations about the nature and effect of their 'light' cigarettes." *First Am. Compl.* at ¶ 35.

But, under Rule 56 and *Cipollone* and *Reilly*, the analysis must extend beyond the allegation. *Cipollone* states that one type of fraudulent misrepresentation claim, what has come to be known as a "warning neutralization" claim, is also pre-empted; that is, a claim "predicated on a state-law prohibition against statements in advertising and promotional materials that tend to minimize the health hazards associated with smoking." 505 U.S. at 527. And in rejecting the Massachusetts Attorney General's "narrow construction" of the relevant statutory language "based on smoking and health" and determining that "at bottom" the state's concern about youth exposure to cigarette advertising was intertwined with a concern about smoking and health, *Reilly* instructs to look beyond the characterization and assess the claim's actual impact. 533 U.S. at 547-48.

To be clear, the Plaintiffs have not argued that the manufacture and sale of Lights constitutes a violation of law. Although Congress could arguably ban the manufacture and sale of cigarettes, including Lights, it has not done so, electing instead to mandate warnings to potential consumers of specified risks. The Plaintiffs contend that, even though Philip Morris has engaged in a lawful business, it should be held legally accountable, because it produced a product it knew contained hidden risks, including enhanced risks of addiction and health problems not apparent or known to the consumer. The Plaintiffs further urge that in choosing the term, "light", to characterize its product, Philip Morris compounded its fault by selecting a term that would mislead the public.

If this were an industry where advertising were not tightly regulated and if the industry agreed with the accusation, it would be free to stop using the offensive term and

to alert consumers of the hidden risks so that they could make informed decisions about whether the benefits exceed the risks or, alternatively, knowingly decide to engage in risky behavior, regardless of the benefits. The price for failing to do so could be the imposition of civil liability, based in part upon the theories the Plaintiffs press here.

But, the tobacco industry is hardly unregulated in what it says to consumers about its products, including light cigarettes. Here, the gist of the Plaintiffs' cause of action runs to what Philip Morris actually said about Lights and what the Plaintiffs claim they should have said. It is true that Philip Morris described the cigarettes as "light" and having "lowered tar and nicotine". But, the record establishes that Congress and the FTC have demonstrated their ability to vigorously restrict tobacco company advertisement and promotion, that Congress and the FTC were aware of the use of these descriptors, that the FTC established a method for testing their accuracy, that the tobacco companies at the behest of the FTC entered into voluntary self-regulation incorporating the FTC Method, and that, despite this, Congress and the FTC never acted to restrict the tobacco companies from using these general descriptors. Other than these descriptors, the record here is devoid of any <u>affirmative</u> misstatement.[30] Thus, the Plaintiffs point to no Philip Morris representation about light cigarettes inconsistent with what the FTC condoned; no evidence Philip Morris ever affirmed that light cigarettes were good for you, were healthy, or would not cause the host of physical problems listed on every package; no evidence that any descriptors Philip Morris applied to Marlboro Lights and to Cambridge

---

[30] The Plaintiffs explain the claim in their memorandum: "…this case is about Philip Morris having deceived Maine consumers by making fraudulent misrepresentations for the last 35 years as to its so-called "Lights" cigarettes. Specifically, Philip Morris intentionally designed its cigarettes so as to register misleadingly low levels of tar and nicotine when tested on a machine, but which would deliver very high levels of these chemicals when actually smoked; and then represented to the smoking public that theses cigarettes were 'light' and 'lowered in tar and nicotine.'" *Pls.' Opp'n* at 2.

Lights contravened what the FTC and Congress knew the tobacco companies as a group and Philip Morris in particular were saying about these cigarettes.

More to the point, what is it the Plaintiffs would have had Philip Morris say about light cigarettes that it did not say?  The Plaintiffs would have Philip Morris disavow the term, light, and adopt some other more accurate descriptor.  But, there is no evidence what, if any, descriptor would accurately describe a low tar and nicotine cigarette. Further, to change the descriptor, light, without explanation would itself cause confusion and would fail to adequately inform the smoking public of the hidden risks forming the basis for this law suit.  To respond to Plaintiffs' concerns, Philip Morris would have to tell the public that the FTC Method test, though accurate in the laboratory, was inaccurate in real life, and that light cigarette smokers consciously or unconsciously gamed the FTC Method test and infused greater amounts of nicotine and tar than the designation "Lights" and "Lowered Tar and Nicotine" would imply.  But, this information, if conveyed through a form of advertising, would run head first into what *Reilly* describes as the "comprehensive federal scheme governing the advertising and promotion of cigarettes". 533 U.S. at 541.  Further, this is not a case where Philip Morris stood silent while producing and selling a product that it knew would hurt the public.  It fully complied with federal directives, placing on every cigarette package, Lights and regulars, the health warnings the federal government mandated.

If Philip Morris had not advertised and promoted its cigarettes as "light" and having "lowered tar and nicotine", the Plaintiffs would have no claim whatsoever.  If they thought they were purchasing Marlboro "full flavor" cigarettes and instead received Marlboro Lights, they could not say that Philip Morris deceived them about the health

benefits of their purchase.  Thus, the law suit is grounded not on the properties of the cigarette itself, but on what the Defendant said about the cigarette - and what they said about the cigarette is substantially intertwined with what the federal government told them to say.  Although the Plaintiffs proclaim that the difference between what they thought they were getting and what they got amounts to deliberate fraud, it is only because Philip Morris labeled the cigarettes and advertised and promoted them as "light" that there is even an arguable difference between perception and product.  But, it is precisely this area that Congress pre-empted as part of "a comprehensive federal scheme governing the advertising and promotion of cigarettes".  *Reilly,* 533 U.S. at 541.  As in *Reilly*, the difference is "intertwined with the concern about cigarette smoking and health".  *Id.* at 548.  This Court must conclude that the Plaintiffs' claims are grounded on Philip Morris's "advertising or promotion of … cigarettes the packages of which are labeled in conformity with the provisions of" federal law and regulation.   15 U.S.C. § 1334(b).  As such, under § 1334(b), they are expressly pre-empted.

## III.   Conclusion

This Court GRANTS Defendant's motion for summary judgment on the ground that Plaintiffs' claims are expressly pre-empted by FCLAA.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 25th day of May, 2006